UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CANOO, INC.,<br><br>                              Plaintiff,<br><br>          v.<br><br>DD GLOBAL HOLDINGS LTD.,<br><br>                              Defendant. | Case No. 1:22-cv-03747-MKV |

**MEMORANDUM OF LAW
IN SUPPORT OF DD GLOBAL HOLDINGS LTD.'S
MOTION TO DISMISS THE AMENDED COMPLAINT**

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
One Manhattan West
New York, New York 10001

*Attorneys for DD Global Holdings Ltd.*

# TABLE OF CONTENTS

Page

I. PRELIMINARY STATEMENT .................................................................................1

II. STATEMENT OF FACTS..................................................................................2

    A.    The Parties ........................................................................................2

    B.    DD Global's Investment in Canoo.........................................................3

    C.    To Comply With the NSA, DD Global Sells
        Shares to Canoo's Chairman in a Private Transaction...............................5

    D.    To Meet the Remaining NSA Requirements, DD Global Engages in a
        Transaction That Leaves Its Pecuniary Interest Unchanged...................7

III. ARGUMENT ....................................................................................................10

    A.    Section 16(b) Generally ...................................................................10

    B.    Application of Section 16(b) to these Facts Would Be an Impermissible
        Extraterritorial Application in Violation of *Morrison* and Due Process...............11

        1.    Applying Section 16(b) to the Alleged Facts Would Constitute an
            Impermissible Extraterritorial Application of the Statute.........................12

            (a)    The Transactions Did Not Occur on U.S. Exchanges...................13

            (b)    The Transaction That Is the Focus of
                Canoo's Section 16(b) Claim Was Not Domestic .........................14

        2.    These Same Factors Counsel Against
            the Exercise of Personal Jurisdiction ..........................................17

    C.    Canoo Has Failed To Plead a Plausible Section 16(b) Claim................................19

        1.    Canoo Fails to Plead a Plausible "Profit" Subject to Disgorgement .........19

        2.    Section 16(b) Should Not Be
            Applied In These Unique Circumstances ..................................23

IV. CONCLUSION.................................................................................................25

**CASES**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012)............................................................................................14

*In re Alstom SA Securities Litigation*,
    741 F. Supp. 2d 469 (S.D.N.Y. 2010)..........................................................................13

*Ashcroft v. Iqbal*,
    556 U.S. 663 (2009)................................................................................................10, 20

*Cavello Bay Reinsurance v. Stein*,
    986 F.3d 161 (2d Cir. 2021)..........................................................................................16

*Chechele v. Standard General L.P.*,
    No. 20 Civ. 3177 (KPF), 2021 WL 2853438 (S.D.N.Y. July 8, 2021) ....................21, 24

*City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014)..........................................................................................13

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014)......................................................................................................17

*Donoghue v. Bulldog Investors General Partnership*,
    696 F.3d 170 (2d Cir. 2012)..........................................................................................11

*Donoghue v. Ghauri*,
    No. 14 Civ. 6383(PAC), 2015 WL 3919120 (S.D.N.Y. June 25, 2015) ........................17

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000)............................................................................................5

*Huang v. Sentinel Government Securities*,
    657 F. Supp. 485 (S.D.N.Y. 1987) ...............................................................................18

*Huppe v. WPCS International Inc.*,
    670 F.3d 214 (2d Cir. 2012)..........................................................................................24

*Kern County Land Co. v. Occidental Petroleum Corp.*,
    411 U.S. 582 (1973)................................................................................................13, 23

*Mersen USA EP Corp. v. TDK Electronics Inc.*,
    No. 21-cv-763(MKV), 2022 WL 902372 (S.D.N.Y. Mar. 28, 2022)..............................18

*Morrison v. National Austl. Bank Ltd.*,
    561 U.S. 247 (2010)..........................................................................................2, 12, 13, 14

*In re Petrobras Securities Litigation*,
150 F. Supp. 3d 337 (S.D.N.Y. 2015) ..........................................................13

*Prime International Trading, Ltd. v. BP P.L.C.*,
937 F.3d 94 (2d Cir. 2019) ...................................................................12, 16

*Reliance Electric Co. v. Emerson Electric Co.*,
404 U.S. 418 (1972) ...................................................................................12

*RJR Nabisco, Inc. v. European Community*,
579 U.S. 325 (2016) ...................................................................................12

*Roth v. Goldman Sachs Group, Inc.*,
740 F.3d 865 (2d Cir. 2014) ..................................................................10, 14

*Rubenstein v. Cosmos Holdings, Inc.*,
No. 19 Civ. 6976 (KPF), 2020 WL 3893347 (S.D.N.Y. July 10, 2020) ...................10, 16

*Rubenstein v. Knight-Swift Transportation Holdings Inc.*,
492 F. Supp. 3d 206 (S.D.N.Y. 2020) ...........................................................24

*Rubenstein v. Live Nation Entertainment*,
No. 16 Civ. 7283, 2017 WL 2670749 (S.D.N.Y. June 20, 2017) .........................11, 20

*Rubenstein v. Urban One, Inc.*,
No. 20 Civ. 11128 (NRB), 2022 WL 125831 (S.D.N.Y. Jan. 13, 2022) ...................11

*SEC. v. Sharef*,
924 F. Supp. 2d 539 (S.D.N.Y. 2013) ...........................................................18

*SEC v. Carrillo Huetell LLP*,
No. 13 Civ. 1735 (GBD), 2014 WL 12785242 (S.D.N.Y. June 4, 2014) ...................18

*SEC v. Revelation Capital Management*,
246 F. Supp. 3d 947 (S.D.N.Y. 2017) .......................................................12, 14, 15

*Segen ex rel. KFx Inc. v. Westcliff Capital Management*,
299 F. Supp. 2d 262 (S.D.N.Y. 2004) ...........................................................21

*Steel Partners II, L.P. v. Bell Industries, Inc.*,
315 F.3d 120 (2d Cir. 2002) .......................................................................23

*United States ex rel. Forman v. AECOM*,
19 F.4th 85 (2d Cir. 2021), cert. denied, 142 S. Ct. 2679 (2022) .........................5

*Wagman v. Astle*,
380 F. Supp. 497 (S.D.N.Y. 1974) ...............................................................19

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980) ................................................................................17

## STATUTES

15 U.S.C. § 78p(b) ............................................................................... *passim*

50 U.S.C. § 4565 ...........................................................................................4

## REGULATIONS

17 CFR § 230.144 .........................................................................................4

17 C.F.R. § 240.16a-13 ..............................................................................24

17 C.F.R. § 240.16b-6 .........................................................................21, 22

17 C.F.R. § 240.16b–7 ...............................................................................24

17 C.F.R. § 242.105 ...................................................................................15

## OTHER AUTHORITIES

Peter Romeo & Alan Dye, *Comprehensive Section 16 Outline* 864 (5th ed. 2019) .....................21

Interpretive Release on Rules Applicable to Insider Reporting and Trading,
    Exchange Act Release No. 18,114, 23 SEC Docket 856 (Sept. 24, 1981) ........................24

Ownership Reports and Trading By Officers, Directors and Principal Security Holders,
    Public Utility Holding Company Act Release No. 25,254, Exchange Act Release
    No. 28,869, Investment Company Act Release No. 17,991, 48 SEC Docket 216
    (Feb. 8, 1991) ..................................................................................21

Arnold S. Jacobs, *Section 16 of the Securities Exchange Act* § 3:31 (2002) ...............................21

DD Global Holdings Ltd. ("DD Global") respectfully submits this memorandum of law in support of its motion to dismiss the First Amended Complaint filed by Canoo Inc. (ECF No. 15) (the "Amended Complaint" or "AC") with prejudice pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure.

## I.
## PRELIMINARY STATEMENT

This lawsuit is a transparent attempt by Canoo Inc. ("Canoo") to obtain an undeserved windfall at the expense of DD Global, a formerly significant shareholder of Canoo, through the misapplication of the federal securities laws and accompanying regulations promulgated by the Securities and Exchange Commission (the "SEC").  In support of its money grab, Canoo invokes Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b) ("Section 16(b)"), a statute that requires "insiders" to disgorge *profits* to the issuer where the insider engaged in matching transactions within a period of less than six months.  While this case suffers from numerous defects – including threshold defects discussed below – the very foundation of the Complaint is far off base.

Section 16(b) requires the disgorgement of *profits*, and the core of Canoo's claim is that it should be the recipient of a "disgorgement" payment of an astonishing $61.1 million of "profits" from DD Global.  At the same time, however, Canoo appears to acknowledge that *DD Global realized no actual profits from the transactions at issue*.  Undeterred by this inconvenient fact, Canoo resorts to contorting an SEC rule that establishes a *cap* on profits subject to disgorgement under Section 16(b), into a method of manufacturing "profits" subject to disgorgement that do not exist.  Canoo's theory, which would require the Court to disregard the actual transaction terms in favor of "market" terms that were neither available to nor received by DD Global, is flat wrong.  Nothing in the governing statute, regulations or law supports Canoo's

effort to rewrite the terms of the actual transactions for the purposes of generating a profit, where there plainly was none. Because Canoo cannot plausibly plead the existence of any profits subject to disgorgement under Section 16(b), its claim fails a matter of law. Further, application of Section 16(b) to the facts alleged in the manner advocated by Canoo, where there were no profits and there was a government-imposed restriction on DD Global's ability to access inside information, would run contrary to the legislative purposes of Section 16(b).

But, while Canoo's claim is manifestly unfair and grossly misplaced, the Court need not even reach the merits, as the case suffers from dispositive threshold defects, including that Section 16(b) cannot be applied extraterritorially, and the application of Section 16(b) to the facts alleged would not be a permissible domestic application of the statute. DD Global is a foreign entity. The alleged liability-creating transaction (*i.e.*, DD Global's acquisition of a "participation note") was a transaction with another foreign entity that occurred entirely overseas and pursuant to an agreement governed by foreign law. Applying Section 16(b) to such a wholly foreign transaction would constitute an impermissible extraterritorial application of the statute, directly conflicting with settled Supreme Court authority. *See Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255, 261 (2010). The same considerations also counsel against the exercise of personal jurisdiction in this matter.

Canoo's claim is defective for multiple reasons, and should be dismissed with prejudice.

## II.
## STATEMENT OF FACTS

### A. <u>The Parties</u>

Canoo presently is a Delaware corporation, headquartered in California, and purports to manufacture consumer and commercial electric vehicles. (AC ¶ 6.) Canoo was

founded in 2017 as a Cayman Islands entity, and became publicly listed on the NASDAQ and domesticated in Delaware in December 2020, after completing a transaction with Hennessy Capital Acquisition Corp. IV ("Hennessy"), a special purpose acquisition company ("SPAC"). (*Id.* ¶¶ 12, 17.)

DD Global is an exempted company organized under the laws of the Cayman Islands, and is alleged to have a registered address in Grand Cayman, and "headquarters" in Hong Kong. (*Id.* ¶ 7.) DD Global is owned by Champ Key Limited, a British Virgin Islands entity, which in turn is indirectly owned by Li Pak Tam, who is alleged to be an investor based in Hong Kong. (*See id.* ¶¶ 7-8.)

## B. **DD Global's Investment in Canoo**

DD Global and its principal were "[o]ne of the two primary original funders of [Canoo]" at the time it was a private Cayman Islands company, beginning in 2017. (*Id.* ¶ 12.) In the early days of Canoo's existence as a private company (at the time, known as Evelozcity Holdings Ltd.), DD Global owned a significant portion of Canoo, and had a significant voting stake in the company. (*See id.* ¶¶ 13-16.) DD Global was owned by multiple different investors at that time. (*See id.* ¶ 13.)

After years as a private company, in September 2020, Canoo announced a transaction with Hennessy, a SPAC, pursuant to which Canoo would become listed on the NASDAQ through a "de-SPAC" transaction and become a Delaware corporation. (*Id.* ¶ 17.) As an investor in Canoo when it was a private company, DD Global's legacy Canoo shares became shares of the publicly-traded company following the de-SPAC transaction. (*Id.*) There are no allegations that DD Global ever acquired any of Canoo's publicly-traded common stock post-listing or engaged in any transactions on the NASDAQ during the relevant period. Following the

de-SPAC transaction, DD Global's interest in Canoo was "approximately 26.4% of the fully diluted shares of Canoo." (*Id.* ¶ 20.)

At the time of the Canoo transaction with Hennessy, DD Global was compelled to enter into a National Security Agreement (the "NSA") with, on behalf of the Committee on Foreign Investment in the United States ("CFIUS"), the U.S. Departments of Defense, Justice, and the Treasury, as the CFIUS Monitoring Agencies. (*See id.* ¶¶ 19-20.)[1] The Amended Complaint alleges that "[t]he NSA limited the control and governance influence of DD Global, which was a significant existing stockholder of Canoo as of the time the NSA was entered." (*Id.* ¶ 19.) The NSA also required DD Global to dispose of a portion of its Canoo shares, reducing its ownership below certain thresholds by specified dates. (*Id.* ¶ 20.) Specifically, DD Global was required to reduce its fully diluted ownership of Canoo to 25% by November 30, 2021, 15% by January 1, 2022 and 10% by February 28, 2022. (*Id.*) If DD Global failed to meet these requirements, it "would have been required to transfer all [its] Canoo shares to a voting trust." (*Id.*)

Notably, while DD Global was obligated to dispose of a significant portion of its Canoo shares under the NSA, the commonly used safe harbor provided by Rule 144 for public resale by stockholders was not available for a former shell company during that time. *See* 17

---

[1] Section 721 of the Defense Production Act of 1950, as amended, 50 U.S.C. § 4565, gives CFIUS the power to review transactions involving foreign investment in a United States businesses involved in certain industries. Among other things, CFIUS is authorized to enter into agreements and impose restrictions on transactions raising concern under the statute. *See* 50 U.S.C. § 4565(l)(3)(A). CFIUS review is triggered by the nature of the business's operations (including whether its operations concern critical technologies or critical infrastructure), and its actions are taken based on national security considerations. Its imposition of conditions is not based on any finding or suggestion of wrongdoing by the relevant parties. *See generally*, 50 U.S.C. § 4565.

C.F.R. § 230.144.  Thus, DD Global was left with a short fuse to dispose of a substantial number of shares, and limited options for selling the requisite shares.

## C.     To Comply With the NSA, DD Global Sells
##          Shares to Canoo's Chairman in a Private Transaction

With limited options to dispose of its shares as required by the NSA, DD Global began discussions with an affiliate of Tony Aquila, Canoo's Chairman, to sell a substantial block of shares in a private transaction.  On October 6, 2021, DD Global entered into a Stock Purchase Agreement and a Lock-Up and Right of First Refusal Agreement with AFV Partners SPV-7 LLC ("AFV-7"), one of Mr. Aquila's entities, to sell 53,600,000 Canoo shares, thereby satisfying DD Global's sales obligations under the NSA in full.  (Amend. 3 to Sched. 13D (Oct. 6, 2021) (Saltzstein Decl. Ex. 1); AC ¶ 21.)[2]  On October 6, 2021, Canoo's stock closed on the NASDAQ at $6.65 per share (AC ¶ 21), having traded over $9.00 per share as recently as September 27.[3] The parties, however, agreed to transact at $6.53 per share, providing Canoo's Chairman a discount to the market price.[4]

---

[2]     A copy of Amendment 3 to Schedule 13D is attached as Exhibit 1 to the Declaration of Susan L. Saltzstein, submitted herewith (the "Saltzstein Decl.").  The Court may consider documents relied upon and integral to the Amended Complaint, such as the relevant transaction documents relied upon by Canoo in framing the Amended Complaint.  *See, e.g.*, *United States ex rel. Forman v. AECOM*, 19 F.4th 85, 107-08 (2d Cir. 2021) (noting that "contracts referenced in the complaint which were essential to the claims" and "documents filed with the [SEC] when they form the basis for the allegations in the complaint" may be considered in connection with a motion to dismiss), *cert. denied*, 142 S. Ct. 2679 (2022).

[3]     The Court may consider Canoo's stock prices in connection with a motion to dismiss. *See, e.g.*, *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000).

[4]     The Amended Complaint alleges that the closing price of Canoo shares was $6.65 on October 6, 2021, when the Stock Purchase Agreement was executed.  (AC ¶ 21.)  The agreed $6.53 transaction price thus was a discount to the October 6, 2021 closing price.

On November 19, 2021, AFV-7 and DD Global entered into an amendment to the

October 6, 2021 stock purchase agreement.  As explained by AFV-7:

> On November 19, 2021, AFV-7 entered into an amendment to the stock purchase agreement originally entered into on October 6, 2021 (as amended, the "Purchase Agreement") with DD Global Holdings Limited.  Pursuant to the original Purchase Agreement, AFV-7 had agreed to purchase shares of the Issuer's Common Stock, and pursuant to the amended Purchase Agreement AFV-7 purchased 35,273,268 shares of the Issuer's Common Stock beneficially owned by DD Global Holdings Limited for an aggregate purchase price of $230,263,000, or $6.53 per share.  The purchase was consummated on November 22, 2021.

> The approximately 44.2 million shares that are currently retained by DD Global (which number does not include earnout shares that may be issued to DD Global and Champ Key) continue to be subject to certain transfer restrictions under a lockup and right of first refusal agreement originally dated October 6, 2021 and amended on November 19, 2021 (as amended, the "Lockup Agreement").  Pursuant to the Lockup Agreement, as amended, such transfer restrictions will be effective until the earlier of (i) the completion of an equity offering by the Issuer and (ii) April 6, 2022, subject to waiver by the Board of Directors of the Issuer and customary exemptions.  Notwithstanding anything to the contrary, the lock-up period automatically expires on (i) December 10, 2021, if the purchase of additional 1,749,031 shares of the Issuer's Common Stock by AFV-7 or its affiliates does not close by such date or (ii) December 23, 2021, if the purchase of additional 16,577,701 shares of the Issuer's Common Stock by AFV-7 or its affiliates does not close by such date.  During the lockup period, AFV-7 will have a right of first refusal to purchase the shares retained by DD Global at the same price and subject to the same terms and conditions pursuant to a bona fide offer to purchase by third parties.  The exercise of the right of first refusal would not require approval of the Board of Directors of the Issuer.

> Following the consummation of the acquisition of the 35,273,268 [shares] by AFV-7 reported in this Amendment, DD Global satisfies the ownership limitations through January 1, 2022 set forth under that certain National Security Agreement, dated December 18, 2020, by and among the Issuer, DD Global and on behalf of the CFIUS, the U.S. Departments of Defense, Justice, and the Treasury as the CFIUS Monitoring Agencies, which requires DD Global to reduce its ownership in the Issuer or transfer all shares of the Issuer's Common Stock beneficially owned by it to a voting trust, if DD Global owns Issuer shares in excess of certain levels as of certain future dates.

(Amend. 4 to Sched. 13D (Nov. 22, 2021) (Saltzstein Decl. Ex. 2); *see also* AC ¶ 23.)  On

November 22, Canoo's stock closed on the NASDAQ at $11.43 per share.  (AC ¶ 23)

Notwithstanding the market price, the sale to AFV-7 (which left DD Global with additional

shares that needed to be disposed of to maintain compliance with the NSA), was completed at the $6.53 per share price agreed on October 6, giving Mr. Aquila's entity an immediate "paper" gain of more than $172 million (*i.e.* 35,273,268 x ($11.43-$6.53)) at the expense of DD Global (had DD Global been able to transaction on the "market").  But DD Global had limited available avenues for disposing of its shares to maintain compliance with the NSA, and was left with a private transaction with Canoo's Chairman at a below-market price.[5]

Thereafter, Canoo's market share price fell nearly as quickly as it had risen, and by January 21, 2021, it fell to a closing price of $5.54.  At that time, DD Global still held shares that needed to be disposed of to maintain compliance with the NSA.

### D.    To Meet the Remaining NSA Requirements, DD Global Engages in a Transaction That Leaves Its Pecuniary Interest Unchanged

On March 15, 2022, DD Global entered into another transaction designed to reduce its direct shareholdings sufficiently to maintain compliance with the NSA.  On that date, DD Global entered into a Share Purchase Agreement with Bank J. Safra Sarasin AG ("BJS").  (AC ¶ 25.)  BJS is a Swiss entity, and the Share Purchase Agreement is governed by Swiss law.  (Amend. 6 to Sched. 13D (Mar. 22, 2022) (Saltzstein Decl. Ex. 3).)  Pursuant to the Share Purchase Agreement, DD Global sold 10.5 million shares to BJS for a total price of $68,565,000

---

[5]    Canoo alleges that the reduction of the number of shares to be purchased by AFV-7 by 18,326,732 was a "very favorable amendment for DD Global" that resulted in "a benefit on paper of $86.69 million."  (AC ¶ 23.)  Canoo, however, omits reference to the other terms of the November 19, 2021 agreements on which it relies, including that DD Global's shares were subject to a lock-up agreement that covered the 18,326,732 shares that AFV-7 failed to purchase as originally agreed.  The lockup of those shares – which required approval of Canoo's board before shares could be sold, other than to AFV – would expire only if AFV-7 failed to purchase the 18,326,732 shares by December 23, 2021.  (*See* Amend. 4 to Sched. 13D (Nov. 22, 2021) (Saltzstein Decl. Ex. 2).)  Thus, the "paper" gain was only to Mr. Aquila, and the amendment left DD Global with a substantial number of shares that still needed to be sold to comply with the NSA and further restrictions on its ability to do so.

(*i.e.*, $6.53 per share). DD Global reported this transaction on its Schedule 13D and Form 4. (*See* AC ¶¶ 25-26; Amend. 6 to Sched. 13D (Mar. 22, 2022) (Saltzstein Decl. Ex. 3); Form 4 (Mar. 16, 2022) (Saltzstein Decl. Ex. 4).)

"Simultaneously" (AC ¶ 26) in a "single, integrated transaction" (*id.* ¶ 25), DD Global acquired a participation note covering the same 10.5 million shares. That participation note was reported on a Form 4 filed by DD Global, which explained:

> DD Global entered into a participation note . . . with a counterparty under which DD Global acquired 10,500,000 notional shares of the Issuer's common stock for a price of $6.720476 per notional share. Under the Participation Note, the counterparty must redeem certain tranches of the notional shares if the Issuer's Common Stock meets certain price targets on or after September 17, 2022, which redemptions are settled in cash. If not earlier extended, the counterparty must redeem all outstanding notional shares on March 17, 2023, which final redemption is settled in cash. During the term of the Participation Note, the counterparty will pay to DD Global all dividends and similar distributions paid on an equivalent number of shares of the Issuer's common stock.

(Form 4 (Mar. 6, 2022) (Saltzstein Decl. Ex. 4).) These allegedly simultaneous transactions "provid[ed] for a net cost to DD Global of approximately $0.19 per share for the simultaneous transactions." (AC ¶ 26.) By acquiring the participation note, DD Global was left with "the economic benefits of ownership of (i.e., a pecuniary interest in) 10.5 million Canoo Inc. common shares." (*Id.* ¶ 3.) Thus, at the end of the day on March 15, 2022, DD Global had exactly the same pecuniary interest in 10.5 million Canoo shares as it had at the beginning of the day, but paid $0.19 per share to maintain compliance with the NSA. Indeed, the only alleged change was that DD Global's interest shifted from direct ownership of Canoo shares, to an indirect interest through the participation notes.

\*    \*    \*    \*

In sum, the Amended Complaint alleges the existence of the following transactions:

8

| Amended Complaint Paragraph(s) | Date(s) | Transaction | Actual Transaction Price |
|---|---|---|---|
| 21-24 | October 6, 2021 agreement November 19, 2021 amendment November 22, 2021 consummation | Sale of 35,273,268 shares in private transaction to entity affiliated with Mr. Aquila | $6.53 |
| 25-26 | March 15, 2022 | Sale of 10,500,000 shares in private transaction to BJS | $6.53 |
| 26 | March 15, 2022 (alleged to be part of a "single, integrated transaction" with March 15, 2022 sale) | Acquisition of "10,500,000 notional shares through a participation note." | $6.72 $6.53 reference price |

As reflected above, all sales by DD Global were undertaken at $6.53. The alleged purchase – the acquisition of the participation note – was undertaken at $6.72, with a reference price of $6.53. Thus, on the alleged terms, DD Global either realized no profit on the transactions (if the reference price for the participation notes is considered), or lost 19 cents per share (if the actual price for the participation note is considered). There simply is no way to match the transactions to generate a profit, and nowhere does the Amended Complaint allege that DD Global realized any actual profit on the transactions at issue. Indeed, the Amended Complaint appears to recognize that the transactions in question came at an expense to DD Global. (*See* AC ¶ 26 (recognizing "net cost" to DD Global stemming from March 2022 transactions).) Nevertheless, Canoo attempts to manufacture a technical profit of $61.1 million and capture that amount for itself through a misapplication of SEC rules. Canoo's claim has no basis in law, and should be dismissed.

## III.
## ARGUMENT

### A.    Section 16(b) Generally

The only claim asserted in the Amended Complaint is for disgorgement of "profits" allegedly received by DD Global in connection with the November 22, 2021 and March 15, 2022 transactions.

Section 16(b) was created to "curb the evils of insider trading" with "a flat rule taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great." *Roth v. Goldman Sachs Grp., Inc.*, 740 F.3d 865, 869 (2d Cir. 2014) (citation omitted).  Thus, Section 16(b) "attaches when 'there was (1) a purchase and (2) a sale of securities (3) by . . . a shareholder who owns more than 10 percent of any one class of the issuer's shares (4) within a six-month period.'" *Id.* (ellipsis in original) (citation omitted).

The existence of disgorgeable profits also is a predicate to liability under Section 16(b); if there are no profits to disgorge, the Section 16(b) claim must be dismissed.  *See Rubenstein v. Cosmos Holdings, Inc.*, No. 19 Civ. 6976 (KPF), 2020 WL 3893347, at *10 (S.D.N.Y. July 10, 2020) ("[T]he Court accepts that [p]laintiff must plausibly allege that [defendant] realized a profit under Section 16(b) for his claim to survive the motion to dismiss.").[6]  Pleading a sustainable Section 16(b) claim therefore requires pleading facts – not mere labels and conclusions – demonstrating the plausible existence of profits subject to disgorgement.  *See Ashcroft v. Iqbal*, 556 U.S. 663, 678 (2009).  As explained below, Canoo's claim fails because there are no profits.

---

[6]     Accordingly, *Rubenstein v. Cosmos Holdings*, a case on which Canoo relies (*see* ECF No. 12, at 2), demonstrates that Canoo's assertion that "disputing *how* to calculate disgorgement is not a basis for a motion to dismiss" (*id.*), is misplaced.

Seeking to avoid the commonsense result that, absent profits, there can be no Section 16(b) claim, Canoo cites *Donoghue v. Bulldog Investors General Partnership*, 696 F.3d 170, 174 (2d Cir. 2012), and argues that Section 16(b) is a "blunt instrument." (ECF No. 12, at 3.) While Section 16(b) may be blunt, it is an instrument nonetheless, and is subject to boundaries and requirements. *See Donoghue*, 696 F.3d at 174 (Section 16(b) "was crafted as a 'blunt instrument,' to 'impose[] a form of strict liability,' by stating that any profits accruing to a director, officer, or 10% beneficial owner of an issuer 'within any period of less than six months . . . shall inure to and be recoverable by the issuer.'" (alterations and ellipsis in original) (citations omitted)). Indeed, because of the strict liability nature of Section 16(b), courts limit its application to when it would serve the goals of the statute, and financial instruments not falling squarely within Section 16(b) should therefore be construed narrowly for Section 16(b) purposes. *See Rubenstein v. Urban One, Inc.*, No. 20 Civ. 11128 (NRB), 2022 WL 125831, at *3 (S.D.N.Y. Jan. 13, 2022) ("[C]ourts have . . . cautioned that financial instruments that do not fall squarely into [Section 16(b)'s] framework are to be construed narrowly to favor the insider because of the strict-liability nature of Section 16(b)." (alterations in original) (citation omitted)). In the same vein, "[c]ourts have cautioned against recasting an actual transaction into something a plaintiff hypothesizes it could have been in order to create liability under Section 16(b)." *Rubenstein v. Live Nation Ent.*, No. 16 Civ. 7283, 2017 WL 2670749, at *6 (S.D.N.Y. June 20, 2017). Nothing about the "bluntness" of Section 16(b) allows a plaintiff to generate profits out of whole cloth, so it can capture them for itself.

**B.     Application of Section 16(b) to these Facts Would Be an Impermissible Extraterritorial Application in Violation of *Morrison* and Due Process**

As discussed more fully below, Canoo's claim fails on the merits. It also suffers from threshold defects that require dismissal without consideration of the merits. Indeed,

Section 16(b) simply should not be applied to the facts alleged, and doing so would constitute an impermissible extraterritorial application of the statute.

### 1. Applying Section 16(b) to the Alleged Facts Would Constitute an Impermissible Extraterritorial Application of the Statute

Section 16(b) is silent as to its extraterritorial reach and "contains nothing to suggest it applies abroad," and, as such, there is a presumption against extraterritorial application of the statute. *See Morrison*, 561 U.S. at 255, 261-62; *see also RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 337 (2016); *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 102-03 (2d Cir. 2019).[7] Because Section 16(b) does not apply extraterritorially, the question shifts to whether the proposed application of the statute is "domestic." As explained below, it is not.

Evaluating whether the application of a statute would be a "permissible domestic application" requires evaluating the "focus" of the statute:

> If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; *but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.*

*RJR Nabisco, Inc.*, 579 U.S. at 337 (emphasis added). The "focus" of Section 16(b) is to remove the "profit" from transactions where the abuse of inside information was possible, a focus addressed by the Section 16(b) remedy of disgorging the profits resulting from short swing transactions. *See Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972) (the intent of Section 16(b) is "to curb the evils of insider trading" through "a flat rule taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great");

---

[7] Although *Morrison* concerned Section 10(b) of the Securities Exchange Act, there is "no principled basis to conclude that *Morrison's* analysis" does not apply here. *See SEC v. Revelation Cap. Mgmt.*, 246 F. Supp. 3d 947, 952 n.7 (S.D.N.Y. 2017).

*see also Kern Cnty. Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 595 (1973) ("The statute requires the inside, short-swing trader to disgorge all profits realized on all 'purchases' and 'sales' within the specified time period, without proof of actual abuse of insider information, and without proof of intent to profit on the basis of such information.").

A securities transaction qualifies as "domestic" for purposes of the analysis if the transaction at issue was either (i) a "transaction[] in securities listed on domestic exchanges" or (ii) a "domestic transaction[] in other securities." *Morrison*, 561 U.S. at 267. As explained below, the acquisition of the participation note, which is the focus of Canoo's Section 16(b) claim, meets neither prong of the *Morrison* test for securities transactions. Application of Section 16(b) in this case therefore would not be a permissible domestic application of Section 16(b), and the Amended Complaint should be dismissed.

### (a) The Transactions Did Not Occur on U.S. Exchanges

Although Canoo common stock is listed on a U.S. exchange, none of the transactions at issue in the Amended Complaint occurred on the exchange. Mere listing of the subject securities on a U.S. exchange, without trading on the exchange, is insufficient to satisfy *Morrison*. *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014) ("*Morrison* does not support the application of § 10(b) of the Exchange Act to claims by a foreign purchaser of foreign-issued shares on a foreign exchange simply because those shares are also listed on a domestic exchange."); *In re Petrobras Sec. Litig.*, 150 F. Supp. 3d 337, 340 (S.D.N.Y. 2015) ("[M]ere listing, without trading, is insufficient to satisfy *Morrison*'s first prong." (citation omitted)); *In re Alstom SA Sec. Litig.*, 741 F. Supp. 2d 469, 473 (S.D.N.Y. 2010) ("That the transactions themselves must occur on a domestic exchange to trigger application of § 10(b) reflects the most natural and elementary reading of *Morrison*."). Thus, the first portion of the *Morrison* test is not met. Moreover, even had the sales of the Canoo

common stock occurred on a U.S. exchange (and they did not), the participation note that is alleged to have given rise to Section 16(b) liability in this case is not listed for trading on a U.S. exchange. The first prong of the *Morrison* test therefore is not satisfied under any analysis.

<p style="text-align:center"><b>(b)</b>      <b>The Transaction That Is the Focus of<br>Canoo's Section 16(b) Claim Was Not Domestic</b></p>

Because Section 16(b) does not apply extraterritorially, and because the transactions at issue did not occur on a U.S. exchange, Canoo's claim can survive only if alleged liability arose from a "domestic transaction[] in other securities." *Morrison*, 561 U.S. at 267. A securities transaction is "domestic" for these purposes only if "the purchaser incurred irrevocable liability within the United States to take and pay for a security, or that the seller incurred irrevocable liability within the United States to deliver a security." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012). Even assuming *arguendo* that the November 22, 2021 sale of Canoo securities to AFV-7 was a "domestic transaction," the March 15, 2022 acquisition of the participation note – the alleged profit-creating transaction – plainly was not, as it occurred wholly outside of the United States.

Section 16(b) liability arises only after two independent transactions have occurred, and it is only after *both* a purchase and sale have occurred and profits have arisen are the concerns of Section 16(b) implicated. *See Roth*, 740 F.3d at 870-71. Thus, because the "focus" of Section 16(b) (*i.e.*, the profits) can exist only after both transactions have occurred, the conduct is "domestic" for purposes of *Morrison* only if *both* the purchase and sale were "domestic" within the meaning of *Absolute Activist*. *See Revelation Cap. Mgmt.*, 246 F. Supp. 3d at 952 (applying *Morrison* in an analogous context). Indeed, applying Section 16(b) where there is only a single domestic transaction would untether Section 16(b) from its "principal focus" – disgorgement of profits – because without both transactions, there can be no profits to

<p style="text-align:center">14</p>

disgorge. Because a necessary element of Canoo's Section 16(b) claim (*i.e.*, a matching acquisition creating the profit) occurred outside of the United States, the conduct that is the focus of Section 16(b) was extraterritorial, and application of Section 16(b) would not be a permissible "domestic" application of the statute under *Morrison*.

In particular, the "focus" of a Section 16(b) is the alleged profits, which do not arise until both transactions have occurred, and the "profits" are created. Thus, under any analysis, the second, profit-creating transaction, must be domestic to satisfy *Morrison* in the context of a Section 16(b) claim. Judge Caproni's decision in *SEC v. Revelation Capital Management, Ltd.*, 246 F. Supp. 3d 947 (S.D.N.Y. 2017) is instructive in this regard. There, looking to Rule 105 of Regulation M's[8] "primary focus" – "the purchase of offering shares" – the Court reasoned that if just one domestic transaction was required to apply Rule 105 (which, like Section 16(b), requires "a two-legged activity in which both legs are necessary to liability," *Revelation Cap. Mgmt.*, 246 F. Supp. 3d at 953), then that one transaction must be the purchase, and not the short sale, because that is the focus of the rule. *Id.* at 955. So too here, where the focus of Section 16(b) – profits resulting from short swing transactions – arises only after the matching transaction has occurred. *See id.* Because the transaction giving rise to the supposed Section 16(b) liability in this case (*i.e.*, the acquisition of the participation note) occurred outside the United States, application of Section 16(b) to these facts would violate *Morrison's* presumption against extraterritorial application of the securities laws.[9]

---

[8]     Rule 105 of Regulation M, 17 C.F.R. § 242.105, "prohibits, during a certain restricted period of time, any person who has sold short securities that are the subject of a registered offering from purchasing the offered securities." *Revelation Cap. Mgmt.*, 246 F. Supp. 3d at 950-51.

[9]     Even if the participation note could somehow be considered a "domestic" transaction, "the presence of a domestic transaction alone cannot satisfy [16(b)'s] geographic requirements;

*(cont'd)*

Canoo's only retort is its citation of *Rubenstein v. Cosmos Holdings, Inc.*, No. 19 Civ. 6976 (KPF), 2020 WL 3893347 (S.D.N.Y. July 10, 2020) (ECF No. 12, at 2), a case originally identified by DD Global in its pre-motion letter. To be sure, in *Cosmos*, the Court concluded that *Morrison* did not prevent application of Section 16(b) in that case. *See id.* at *10-11. But that is of no assistance to Canoo here. First, *Cosmos* is distinguishable. There, the alleged profit-creating transactions were "eight open-market sales" of stock. *Id.* at *1. Accordingly, even if the original purchase occurred in a private overseas transaction, the "profits" subject to disgorgement arose from the later sales of U.S.-listed securities on a U.S.-based stock exchange. *Id.* at *1-2. Thus, the "focus" of Section 16(b) (*i.e.*, the creation of the profits) arose from the second-in-time U.S. transactions – the inverse of the facts alleged here. Second, the *Cosmos* Court noted that "Defendants failed to address Plaintiff's argument in their reply papers" and failed to "present[] any argument that both the purchase and sale comprising a short-swing profit violation would need to occur in the United States to satisfy the principles espoused in *Morrison*." *Id.* at *11. The Court went on to specifically note that it would not "make Defendants' arguments for them." *Id.* There also is no indication that the *Cosmos* court's attention was drawn to *Revelation Capital Management*. Accordingly, even if *Cosmos* were apposite (and it is not), it is of limited value to Canoo's claim given that the defendants' arguments were not squarely presented.

---

claims must not be so predominantly foreign as to be impermissibly extraterritorial." *Cavello Bay Reinsurance v. Stein*, 986 F.3d 161, 165, 168 (2d Cir. 2021) (quoting *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014)). Indeed, "[p]ermitting a suit to go forward any time a domestic transaction is pleaded would turn the presumption against extraterritoriality into a 'craven watchdog,' and would fly in the face of the Supreme Court's clear guidance that the presumption against extraterritoriality cannot evaporate any time '*some* domestic activity is involved in the case'" *Prime Int'l Trading*, 937 F.3d at 106 (citation omitted). Here, the participation note is predominantly foreign such that *Morrison* operates to prevent application of Section 16(b).

Under *Morrison* and its progeny, Section 16(b) should not be applied to the facts alleged here, where the alleged liability-creating transaction: (i) occurred outside the United States; (ii) between non-U.S. entities; and (iii) involved a non-U.S. traded security (iv) that was not issued by a U.S.-entity. Canoo's claim should be dismissed for this reason alone.

### 2. These Same Factors Counsel Against the Exercise of Personal Jurisdiction

For the same reasons, it would not be reasonable to exercise personal jurisdiction over DD Global in this case. For claims under the Securities Exchange Act, personal jurisdiction over a foreign defendant is evaluated based on the defendant's contact with the United States as a whole. *See Donoghue v. Ghauri*, No. 14 Civ. 6383(PAC), 2015 WL 3919120, at *3 (S.D.N.Y. June 25, 2015).[10] This requires analyzing whether "the defendant's conduct and connection with the [United States] are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). "Foreseeability" that conduct might cause harm in the United States alone is insufficient to satisfy the requirements of due process. *Id.* at 295-96.

In this case, DD Global (a Cayman entity) invested in a private company formed under the laws of the Cayman Islands, and is alleged to have interacted with that private company prior to its becoming a publicly-traded company.[11] (*See* AC ¶¶ 12-16 (alleging nature of DD Global's relationship with Canoo as a private Cayman company); *id.* ¶¶ 17, 19 (alleging

---

[10]    Canoo's reliance on *Ghauri* in its pre-motion letter is misplaced. (*See* ECF No. 12, at 2.) That case involved a defendant executing the subject trades on a U.S. stock exchange – a critical fact that is not present in this case. *See Ghauri*, 2015 WL 3919120, at *3.

[11]    These allegations do not come close to establishing general jurisdiction over DD Global, which is not alleged to either be incorporated in nor have a place of business in the United States. *See Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014).

that DD Global entered into the NSA prior to the public listing of the Canoo securities).) But the only allegations concerning post-public listing conduct (when Section 16(b) could apply) are that DD Global entered into a private transaction with AFV-7 in 2021 (*id.* ¶¶ 21-22), and private transactions on March 15, 2022 that occurred overseas involving a non-U.S. security. With respect to the AFV-7 transaction, there are no allegations that DD Global visited the United States in connection with that transaction, or executed the relevant agreement in the United States.[12] *See SEC v. Sharef*, 924 F. Supp. 2d 539, 545 (S.D.N.Y. 2013) (litigation must arise out of contacts to satisfy jurisdictional inquiry); *Huang v. Sentinel Gov't Sec.*, 657 F. Supp. 485, 488 (S.D.N.Y. 1987) (similar).

At bottom, given the facts alleged, it would not be reasonable to assert personal jurisdiction over DD Global for purposes of a Section 16(b) claim where it invested in a private Cayman company and the alleged liability-creating transaction was the overseas acquisition of a participation note that is not a U.S. issued, let alone traded, security. *See SEC v. Carrillo Huetell LLP*, No. 13 Civ. 1735 (GBD), 2014 WL 12785242, at *5 (S.D.N.Y. June 4, 2014) (sale of unregistered share of U.S. company does not automatically create jurisdiction).

To be sure, the facts presented by the case are unique, and there is limited authority addressing personal jurisdiction in the context of a Section 16(b) claim, which

---

[12] Although Canoo cites to a choice of law and forum selection provision contained in the Stock Purchase Agreement, Canoo is not a party to that agreement. *See Mersen USA EP Corp. v. TDK Elec. Inc.*, No. 21-cv-763(MKV), 2022 WL 902372, at *9-10 (S.D.N.Y. Mar. 28, 2022) (granting motion to dismiss for lack of personal jurisdiction where, "[s]ave the forum selection clause, this matter has nothing to do with New York"). Moreover, the provision is limited to claims relating to the agreement (AC ¶ 22), but Canoo's claim allegedly did not accrue until several months after the execution of the Stock Purchase Agreement, when the participation note was acquired under foreign law. The other forum selection provision identified by Canoo (contained in the NSA) is even further afield. (*Id.* ¶ 19.) In all events, neither agreement contains a consent to jurisdiction in this forum.

generally arises in connection with trades that occur in the United States. *Wagman v. Astle*, 380

F. Supp. 497, 502 (S.D.N.Y. 1974), however, is instructive. There, the court confronted a

situation involving a Canadian corporation listed on the American Stock Exchange and foreign

defendants alleged to have realized Section 16(b) profits through transactions occurring in

Canada. *Id.* at 498-99. Notwithstanding the fact that the issuer's common stock was listed on a

U.S. stock exchange, the court concluded that there were insufficient contacts with the United

States by the defendant to satisfy due process considerations. *Id.* at 502.[13] Thus, even if Section

16(b) could be applied to the conduct alleged here, it would not be reasonable to exercise

personal jurisdiction over DD Global on the basis of the facts alleged.

**C.     Canoo Has Failed To Plead a Plausible Section 16(b) Claim**

Although the Canoo's claim is unsustainable because of the aforementioned

threshold defects, it also is defective on the merits. Indeed, even if Canoo could assert a Section

16(b) claim on the facts alleged (and, as discussed above, it cannot), the asserted claim still fails

as a matter of law.

**1.     Canoo Fails to Plead a Plausible "Profit" Subject to Disgorgement**

As explained above, the existence of a disgorgeable profit is an element of a

Section 16(b) claim and, absent the plausible existence of such a profit, a Section 16(b) claim

must be dismissed. Recognizing that there is no way to match the actual transactions at issue to

generate any profit that could be subject to disgorgement, Canoo instead attempts to manufacture

a profit out of whole cloth by looking to the "market" price of Canoo securities on each date (as

calculated by Canoo), and matching those "market" prices. Indeed, according to Canoo, the

---

[13]     In evaluating the reasonableness of the exercise of personal jurisdiction, the *Wagman* court also looked to the "unique characteristics" of Section 16(b), and the fact that no other country has a rule akin to Section 16(b). *See Wagman*, 380 F. Supp. at 501.

Court should apply the following imagined transaction terms to calculate Section 16(b) profits, notwithstanding DD Global that did not obtain those "market" prices:

| Date | Transaction Type | Actual Price | "Market" Price |
|---|---|---|---|
| November 22, 2021[14] | Sell | $6.53 | $11.26 |
| March 15, 2022 | Buy | $6.72 | $5.44 |

(*See* AC ¶¶ 35-38.)[15]

Canoo boldly asserts that this "method" of disregarding actual transaction terms is "the Second Circuit's established method of calculating disgorgeable 'profits' from short-swing trading." (AC ¶ 4.) Not so. Canoo has identified no case that has ever applied Section 16(b) in the manner it advocates. Rather, its theory appears to be founded on a misreading of 17 C.F.R. § 240.16b-6(c)(2) ("Rule 16b-6(c)(2)"), which addresses matching derivative transactions with non-derivative transactions. Rule 16b-6(c)(2) provides that, in such circumstances, Section 16(b) profits "***shall not exceed*** the difference in price of the underlying security on the date of

---

[14] DD Global does not agree that November 22, 2022 is the appropriate transaction date for Section 16(b) purposes. *See, e.g., Live Nation*, 2017 WL 2670749, at *4 (relevant date is when irrevocable liability to sell the shares was incurred).

[15] Canoo speculates in a footnote to its pre-motion letter that "it [is] imperative that there be an opportunity to learn through discovery what payments were required to be made" and that the March transaction does not represent what it deems "rational investor behavior, which leads to questions as to what payments were actually made and whether the only correct measure of the derivative purchase price for 16(b) profit calculation purposes is the underlying trading price on such date." (ECF No. 12, at 3 n.2.) This last-ditch effort by Canoo to save its claim is unavailing, and Canoo's unadorned musings fail to state a plausible claim. *See Ashcroft*, 556 U.S. at 678 (a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).) Moreover, Canoo pleads facts demonstrating why this transaction was rationale investor behavior in view of the NSA and other requirements to which DD Global was subject. Indeed, it is these same restrictions that allowed Canoo's Chairman to reap a substantial paper profit at DD Global's expense in November 2021, acquiring a substantial number of shares at below the "market" price.

purchase or sale and the date of sale or purchase." *Id.* (emphasis added). On its face, Rule 16b-6(c)(2) provides a *ceiling* on the extent of a party's liability under Section 16(b). It does not prescribe an exclusive method – nor does it reflect an "established method" (AC ¶ 4) – for calculating disgorgement of profits pursuant to Section 16(b).[16]

The SEC adopting release issued in connection with its promulgation of Rule 16b-6(c)(2) confirms that Canoo's theory is wrong: "the *maximum* short-swing profit recovery is the difference in market value of the underlying security between the date of purchase and the date of sale. *If an insider can demonstrate that the amount of profit was less, then a court can order a lesser recovery.*" Ownership Reports and Trading By Officers, Directors and Principal Security

---

[16]    The cases cited by Canoo do not support its argument. (*See* ECF No. 12, at 2.) In *Segen ex rel. KFx Inc. v. Westcliff Capital Management*, 299 F. Supp. 2d 262 (S.D.N.Y. 2004) the court considered the *maximum* amount subject to disgorgement pursuant to Section 16(b), and concluded that, pursuant to Rule 16b-6(c)(2), the defendants already had disgorged the *maximum* amount recoverable under Section 16(b) because of the cap set in Rule 16b-6(c)(2). *Id.* at 272-73. Nothing in *KFx, Inc.* supports Canoo's argument that the cap set forth in Rule 16b-6(c)(2) can be utilized to *increase* (rather than limit) a defendant's profits for Section 16(b) purposes. Indeed, *KFx Inc.* repeatedly refers to Rule 16b-6(c)(2) as setting a "cap" and the "maximum" recovery. Canoo's citation to two treatises is no different. (*See* ECF No. 12, at 2.) Both treatises discuss Rule 16b-6(c)(2) as setting a cap, not as a means of creating profits where there are none. *See* Peter Romeo & Alan Dye, *Comprehensive Section 16 Outline* 864 (5th ed. 2019) ("Rule 16b-6(c)(2) states that the maximum profit on short-swing transactions not involving identical derivative securities is the difference between the market price of the underlying security on the states of purchase and sale, with the result that the recoverable profit often is considerably less than the spread between the exercise price and sale price."); Arnold S. Jacobs, *Section 16 of the Securities Exchange Act* § 3:31 (2002) ("This formulation does not dictate how profit is computed, but merely establishes a ceiling on the amount recoverable . . . [T]he cap probably overstates the profit when one or both of the derivative securities was out of the money at the time of the transaction.").

Canoo's citation to *Chechele v. Standard General L.P.*, No. 20 Civ. 3177 (KPF), 2021 WL 2853438 (S.D.N.Y. July 8, 2021) is equally misplaced. That case discusses matching transactions using the "lowest price in, highest price out" method of calculating profits. *Id.* at *10 (citation omitted). Here, there is no way to match the transactions in question to create a profit, and nothing in *Standard General* allows re-imagining transaction terms to create a profit subject to disgorgement.

Holders, Public Utility Holding Company Act Release No. 25,254, Exchange Act Release No. 28,869, Investment Company Act Release No. 17,991, 48 SEC Docket 216, 235 (Feb. 8, 1991) (emphasis added). Here, the facts alleged in the Amended Complaint conclusively demonstrate that the amount of the profit received by DD Global from the subject transactions was less than the ceiling established by Rule 16b-6(c)(2) and that there, in fact, were no profits from the alleged transactions. Accordingly, there is no plausible claim of disgorgeable profits, and the Section 16(b) claim must be dismissed.

This conclusion is further bolstered by 17 C.F.R. § 240.16b-6(c)(1) ("Rule 16b-6(c)(1)"). Rule 16b-6(c)(1) provides that where derivative transactions have identical characteristics, Section 16(b) profits are to be calculated "by the actual prices paid or received." *Id.* Here, the Amended Complaint alleges that the November 22, 2021 transaction was a sale of common stock (to be sure, not a derivative instrument) at the actual price of $6.53 per share. The Amended Complaint further alleges that the March 15, 2022 transaction involved the acquisition of a participation note by which DD Global "acquired the economic benefits of ownership in (i.e., a pecuniary interest in) 10.5 million Canoo Inc. common shares." (AC ¶ 3; *see also id.* ¶ 26 (alleging the transaction should be "treated for Section 16(b) purposes as a purchase of common shares").) As the Amended Complaint alleges that the subject transactions both had the identical benefits of ownership (*i.e.*, that of common shares), Rule 16b-6(c)(1) further counsels in favor of matching the *actual* prices of the transactions, not the "market" prices which were not employed (or available).

In the final analysis, the Court should reject Canoo's effort to apply transaction prices that were neither available to nor received by DD Global for the sole purpose of creating a

profit to be disgorged.  Nothing in Section 16(b), the SEC's accompanying rules or the law supports such an unjust outcome.

### 2.    Section 16(b) Should Not Be Applied In These Unique Circumstances

The unique nature of DD Global's predicament and the transaction at issue here further counsel against applying Section 16(b) to these circumstances, particularly in the bizarre manner advocated by Canoo.  "Where, as here, the transaction at issue does not plainly fall within the literal terms of the statute, '[t]he judicial tendency, especially in this circuit, has been to interpret Section 16(b) in ways that are most consistent with the legislative purposes.'"  *Steel Partners II, L.P. v. Bell Indus., Inc.*, 315 F.3d 120, 124 (2d Cir. 2002) (alteration in original) (citation omitted); *see also Kern Cnty.*, 411 U.S. at 594-95 ("[C]ourts have come to inquire whether the transaction may serve as a vehicle for the evil which Congress sought to prevent – the realization of short-swing profits based upon access to insider information.").

Here, the legislative purpose of Section 16(b) would not be advanced by application of Section 16(b) in the manner sought by Canoo.  Canoo concedes that despite its ownership of Canoo shares, DD Global's "control and governance influence" was limited by the NSA.  (AC ¶ 19.)  Likewise, DD Global was compelled to dispose of a significant portion of its stockholdings by the NSA.  (*Id.* ¶ 20.)  After being exploited by Canoo's management through a below-market sale to maintain temporary compliance with the NSA's shareholding reduction requirements (*id.* ¶¶ 21-23), DD Global engaged in a transaction that changed the form of its ownership from direct ownership of common stock, to an indirect interest in the same common stock – a transaction designed to maintain compliance with the NSA in an economically efficient manner.  Canoo concedes that DD Global's pecuniary interest was unchanged as a result of the March 15 transaction.  (*See id.* ¶ 3.)   Applying Section 16(b) where there was no access to inside

information, no profit, and no change in pecuniary interest would run contrary to the legislative purpose of the statute, as none of its concerns are implicated.[17]

That Section 16(b) should not be applied in these unique circumstances is further confirmed by Rule 16a-13, in which the SEC has exempted from Section 16 "[a] transaction . . . that effects only a change in the form of beneficial ownership without changing a person's pecuniary interest in the subject equity securities." 17 C.F.R. § 240.16a-13;[18] *cf. Chechele*, 2021 WL 2853438, at *10 (exemption unavailable where transactions resulted in change in pecuniary interest). Much like a Rule 16a-13 transaction, the March 15 transaction was "simultaneous," and left DD Global with an unchanged pecuniary interest. (AC ¶ 3.) Indeed, all that allegedly changed was the form of DD Global's ownership – from direct ownership, to an indirect interest through the participation note. The same policy reasons that underly Rule 16a-13 support exempting the March 15 participation note from the scope of Section 16(b).

---

[17] *Huppe v. WPCS International Inc.*, 670 F.3d 214 (2d Cir. 2012) cited by Canoo (*see* ECF No. 12, at 3), is readily distinguishable. That case involved a transaction falling squarely within the literal terms of Section 16(b), and nothing prevented influence over the issuer. *Id.* at 219. Here, the NSA foreclosed such influence by DD Global over Canoo, and the unique circumstances and transactions do not fall within the literal terms of Section 16(b). *Rubenstein v. Knight-Swift Transportation Holdings Inc.*, 492 F. Supp. 3d 206, 217 (S.D.N.Y. 2020), cited by Canoo (ECF No. 12, at 3) does not change the analysis, and simply discusses application of Section 16(b) to derivative transactions.

[18] The policies undergirding Rule 16b-7 also support this conclusion. That Rule exempts transactions of exchange involved in the merger or consolidation of companies where 85 percent or more of all of the assets or securities of one of the companies involved is owned by the other company. *See* 17 C.F.R. § 240.16b–7(a)(2). In part, this exemption is premised on the understanding that such transactions "do not present significant opportunities to insiders to profit by advance information." Interpretive Release on Rules Applicable to Insider Reporting and Trading, Exchange Act Release No. 18,114, 23 SEC Docket 856, 924 (Sept. 24, 1981) (citation omitted)). And further, as is precisely the case here, such transactions "do not significantly alter in an economic sense the type of security which the insider held prior to the transaction." *Id.*

No goal or purpose of Section 16(b) would be fostered by applying the statute here.  There were no profits received by DD Global, and the NSA foreclosed the use of inside information and compelled the sale of DD Global's Canoo shares.[19]  Moreover, there was no actual change in pecuniary interest in connection with the transaction Canoo seeks to designate as the "transaction that triggered DD Global's Section 16(b) liability."  (ECF No. 12, at 3.)  Indeed, the only result of applying Section 16(b) in the manner advocated by Canoo would be to give it a substantial undeserved windfall at the expense of DD Global for no valid policy, deterrent, or other reasons.  Section 16(b) therefore should not be applied to the unique circumstances that exist in this case.

## IV.
## CONCLUSION

DD Global respectfully requests that the Amended Complaint be dismissed.

Dated:  New York, New York
         September 20, 2022

<div style="margin-left: 40%;">

/s/ Susan L. Saltzstein

Susan L. Saltzstein
Jeffrey S. Geier
 SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
Susan.Saltzstein@skadden.com
Jeffrey.Geier@skadden.com
*Attorneys for DD Global Holdings Ltd.*

</div>

---

[19]     Canoo's argument that the NSA did not compel DD Global "to acquire economic interest in Canoo common shares when it entered the participation note" misses the point.  (*See* ECF No. 12, at 3.)  While the NSA did not "compel" Canoo to acquire a participation note, it did require DD Global to dispose of its direct interest in Canoo shares, which DD Global elected to do through the "simultaneous" transaction that left its pecuniary interest in the shares unchanged.  Indeed, the end result of the March 15 "simultaneous transaction" was akin to the default provision under the NSA which would have required DD Global to transfer all of its shares to a voting trust.  (*See* AC ¶ 20.)